IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DENNIS E. KERSHNER,           :
                              :
        Plaintiff             :    CIVIL NO. 4:11-CV-00733
                              :
     vs.                      :
                              :
MICHAEL J. ASTRUE,            :
COMMISSIONER OF SOCIAL        :    (Judge Rambo)
SECURITY,                     :
                              :
        Defendant             :

## MEMORANDUM

## Background

The captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Dennis E. Kershner's claim for supplemental security income benefits.

Supplemental security income (SSI) is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.

Kershner, who was born in the United States on April 29, 1951, completed the 10th grade and can read, write, speak and understand the English language. Tr.

30, 47, 97, 144 and 149.[1]  During his elementary and secondary schooling Kershner attended regular education classes. Tr. 149.  Kershner's past relevant employment[2] consists of working as an accounts manager/delivery person for a rental company (9 hours per day, 6 days per week) from 1995 to May, 1998, and as a taxi cab driver from 2003 to February, 2006 (10 hours per day, 7 days per week) and during January, 2007 (8 hours per day, 5 days per week). Tr. 43, 146 and 169.

Kershner's work as an accounts manager/delivery person and taxi cab driver was described by a vocational expert as ranging from semi-skilled, medium to very-heavy work.[3] Tr. 43. Kershner stated that in the

---

1.  References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of his Answer on June 22, 2011.

2.  Past relevant employment in the present case means work performed by Kershner during the 15 years prior to the date his claim for benefits was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

3.  The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

      (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and
                                      (continued...)

---

3.   (...continued)
        occasionally lifting or carrying articles like
        docket files, ledgers, and small tools.
        Although a sedentary job is defined as one
        which involves sitting, a certain amount of
        walking and standing is often necessary in
        carrying out job duties.  Jobs are sedentary if
        walking and standing are required occasionally
        and other sedentary criteria are met.

        (b) *Light work*.  Light work involves lifting no
        more than 20 pounds at a time with frequent
        lifting or carrying of objects weighing up to
        10 pounds.  Even though the weight lifted may
        be very little, a job is in this category when
        it requires a good deal of walking or standing,
        or when it involves sitting most of the time
        with some pushing and pulling of arm or leg
        controls.  To be considered capable of
        performing a full or wide range of light work,
        you must have the ability to do substantially
        all of these activities. If someone can do
        light work, we determine that he or she can
        also do sedentary work, unless there are
        additional limiting factors such as loss of
        fine dexterity or inability to sit for long
        periods of time.

        (c) *Medium work*.  Medium work involves lifting
        no more than 50 pounds at a time with frequent
        lifting or carrying of objects weighing up to
        25 pounds. If someone can do medium work, we
        determine that he or she can do sedentary and
        light work.

        (d) *Heavy work*.  Heavy work involves lifting no
        more than 100 pounds at a time with frequent
        lifting or carrying of objects weighing up to
        50 pounds. If someone can do heavy work, we
        determine that he or she can also do medium,
                                        (continued...)

3

accounts manager/delivery person position he was
required to make telephone calls to customers regarding
payments and that he also made appliance deliveries. Tr.
146.  He also indicated his duties included writing and
completing reports. Id.

Records of the Social Security Administration
reveal that Kershner had earnings in the years 1969
through 2008. Tr. 135.  Kershner's total reported
earnings during those years were $157,720.55. Id.

The record reveals that Kershner also worked as
a taxi cab driver during (1) the 3rd and 4th quarters of
2008 and (2) August, 2009.  Tr. 18, 31, 49 and 184.

Kershner earned $15,117.36 in 2004, working as a
taxi cab driver; $19,445.89 in 2005; $6771.53 in 2006;

_____

3.  (...continued)
        light, and sedentary work.

        (e) *Very heavy work*.  Very heavy work involves
        lifting objects weighing more than 100 pounds
        at a time with frequent lifting or carrying of
        objects weighing 50 pounds or more.  If someone
        can do very heavy work, we determine that he or
        she can also do heavy, medium, light and
        sedentary work.

20 C.F.R. § 416.967.

and $1191.89 in 2007.  During the 3rd and 4th quarter of
2008, Kershner earned a total of $3216.00 working as a
taxi cab driver. Tr. 49.  As for the 1st and 2nd quarters
of 2008, the record reveals that Kershner worked at a
Bob Evans and a Mister Donut earning a total of $448.00
Tr. 49-50.  Our review of the record did not reveal
Kershner's 2009 earnings.  Kershner has no reported work
or earnings since August, 2009. Tr. 31.

On April 30, 2008, Kershner protectively filed[4]
an application for supplemental security income
benefits. Tr. 47, 133 and 179.  Kershner claims that he
became disabled on May 1, 2006, because of lower back
problems, a herniated lumbar disc, a pinched nerve in
the right leg, arthritis in the knees, diabetes, high
blood pressure and blurry vision. Tr. 40 and 145.
Kershner claims that he cannot sit or stand for long
periods of time. Tr. 145.  He also contends that he
cannot walk up steps or lift anything. Id.  In a

---

4.  Protective filing is a term for the first time an
individual contacts the Social Security Administration
to file a claim for benefits.  A protective filing date
allows an individual to have an earlier application
date than the date the application is actually signed.

document entitled "Function Report – Adult" when asked to describe what he did from the time he woke up in the morning until the time he went to bed, he wrote "nothing." Tr. 154.  He later indicated that he occasionally cared for his son but that his wife did the cooking and shopping, and that he did no house or yard work. Tr. 155-157.  He claimed that he had difficulty dressing and bathing. Tr. 155.  He stated that he could only lift 10 pounds and walk two blocks. Tr. 159

Kershner's alleged disability onset date of May 1, 2006, has no impact on Kershner's application for supplemental security income benefits because supplemental security income is a needs based program and benefits may not be paid for "any period that precedes the first month following the date on which an application is filed or, if later, the first month following the date all conditions for eligibility are met."  See C.F.R. § 416.501.  Consequently, Kershner is not eligible for SSI benefits for any period prior to May 1, 2008.

On July 15, 2008, the Bureau of Disability Determination[5] denied Kershner's application. Tr. 16 and 51-55.  On July 23, 2008, Kershner requested a hearing before an administrative law judge. Tr. 16 and 60. After approximately 16 months had passed a hearing was held before an administrative law judge on November 17, 2009. Tr. 16 and 26-46.  On November 24, 2009, the administrative law judge issued a decision denying Kershner's application for benefits. Tr. 16-25.  On December 4, 2009, Kershner filed a request for review of the administrative law judge's decision with the Appeals Council of the Social Security Administration. Tr. 10 and 12.  Counsel for Kershner filed a brief with the Appeals Council on December 2, 2010. Tr. 5 and 186-195. After about 4 months had elapsed, the Appeals Council concluded that there was no basis upon which to grant Kershner's request for review. Tr. 1-6. Thus, the

---

5.  The Bureau of Disability Determination is an agency of the Commonwealth of Pennsylvania which initially evaluates applications for supplemental security income benefits on behalf of the Social Security Administration. Tr. 51.

administrative law judge's decision stood as the final decision of the Commissioner.

Kershner then filed a complaint in this court on April 18, 2011.  Supporting and opposing briefs were submitted and the appeal[6] became ripe for disposition on May 4, 2012, when Kershner elected not to file a reply brief.

For the reasons set forth below we will affirm the decision of the Commissioner denying Kershner's application for supplemental security income benefits.

**Standard of Review**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See <u>Poulos v. Commissioner of Social Security</u>, 474 F.3d 88, 91 (3d Cir. 2007); <u>Schaudeck v. Commissioner of Social Sec. Admin.</u>, 181 F.3d 429, 431 (3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the

---

6. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

Commissioner's findings of fact pursuant to 42 U.S.C. §
405(g) is to determine whether those findings are
supported by "substantial evidence." Id.; Brown v.
Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v.
Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual
findings which are supported by substantial evidence
must be upheld. 42 U.S.C. §405(g); Fargnoli v.
Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the
ALJ's findings of fact are supported by substantial
evidence, we are bound by those findings, even if we
would have decided the factual inquiry differently.");
Cotter v. Harris, 642 F.2d 700, 704 (3d Cir.
1981)("Findings of fact by the Secretary must be
accepted as conclusive by a reviewing court if supported
by substantial evidence.");  Keefe v. Shalala, 71 F.3d
1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d
171, 176 (4th Cir. 2001);  Martin v. Sullivan, 894 F.2d
1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such
relevant evidence as a reasonable mind might accept as
adequate to support a conclusion.'" Pierce v. Underwood,

9

487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the

evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## Sequential Evaluation Process

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such

11

severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating supplemental security income claims.  See 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[7] (2) has an impairment that is severe or a combination of impairments that is

---

7.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 416.910.

severe,[8] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[9] (4) has the residual functional

---

8.   The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 416.945(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 416.945(c).


9.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential

(continued...)

capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[10]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined

_____

9.  (...continued)
evaluation process proceeds to the next step.

10.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

14

as that which an individual is still able to do despite
the limitations caused by his or her impairment(s)."").

**Medical Records**

The medical records reveal that Kershner was
treated only for physical problems.  The impetus
purportedly for Kershner's alleged back problems was a
work-related incident which occurred in or about 1998.
We will commence with the medical record relating to
that incident.

On September 2, 1998, Kershner was examined by
Paul S, Lin, M.D., an orthopedist, in Lewisburg,
Pennsylvania. Tr. 204-205. Dr. Lin issued a letter
regarding that appointment on September 10, 1998.  That
letter states in pertinent part as follow:

> Mr. Kershner is a 47-year-old gentleman who has
> worked at Rainbow Rental now for approximately
> five years.  He is an account manager. He
> explained to me that this job entails him
> managing over 300 accounts.  He makes sure that
> the rentals are paid appropriately and delivers
> or repossesses the furniture as necessary.  At
> times this involves heavy lifting, including
> moving furniture such as refrigerators, living
> room sets, bedroom sets, TVs, et cetera.  Mr.
> Kershner states that he had one back injury in

December 1997 from which he recovered and then
a second one in May 1998, which he is still
suffering from.  As part of his workup, he has
had two MRIs, one done in January and one done
in June 1998.  Both were performed at the same
facility in Wilkes-Barre.  I have been able to
review both MRIs myself, as well as the reports.
Both scans, in my opinion, and judging from the
reports of the radiologist state that there was
no evidence of a disc herniation, but there is
very mild spondylolisthesis at L-5, S-1. . . .[11]

---

11.  "The word spondylolisthesis derives from two parts
- spondylo which means spine, and listhesis which means
slippage. So, a spondylolisthesis is a forward slip of
one vertebra (i.e., one of the 33 bones of the spinal
column) relative to another. Spondylolisthesis usually
occurs towards the base of your spine in the lumbar
area. . . Spondylolisthesis can be described according
to its degree of severity. One commonly used
description grades spondylolisthesis, with grade 1
being least advanced, and grade 5 being most advanced.
The spondylolisthesis is graded by measuring how much
of a vertebral body has slipped forward over the body
beneath it." Spineuniverse.com, Spondylolisthesis: Back
Condition and Treatment, http://www.spineuniverse.com/
conditions/spondylolisthesis/spondylolisthesis-back-con
dition-treatment (Last accessed August 15, 2012). Grad
1 spondylolisthesis is where up to 25% of the vertebral
body has slipped forward over the vertebral body
beneath it. Id. Symptoms of this condition include pain
in the lower back, pain and weakness in one or both
legs, and an altered gait. Id.  Some people who have
this condition exhibit no symptoms. Id.  A condition
which may cause spondylolisthesis is spondylolysis.
This condition "is a defect in the connection between
vertebrae, the bones that make up the spinal column.
This defect can lead to small stress fractures (breaks)
(continued...)

Tr. 204.   The letter further reveals that a physical examination of Kershner by Dr. Lin was essentially normal, including a benign straight leg raising test,[12] normal reflexes and muscle strength, and normal lumbar range of motion. Tr. 204-205.   Kershner denied "any

---

11.   (...continued)
in the vertebrae that can weaken the bones so much that one slips out of place, a condition called spondylolisthesis.   Spondylolisthesis is a very common cause of low back pain." Cleveland Clinic, Diseases & Conditions, Spondylolysis, http://my.clevelandclinic. org/disorders/back_pain/hic_spondylolysis.aspx (Last accessed August 15, 2012).   "Many people with spondylolysis have no symptoms and don't even know they have the condition. . . [It] results from a weakness in a section of the vertebra called the pars interarticularis, the thin piece of bone that connects the upper and lower segments of facet joints.   Facet joints link the vertebrae directly above and below to form a working unit that permits movement of the spine." Id.

12.   The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc.   The patient, either lying or sitting with the knee straight, has his or her leg lifted.   The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed August 15, 2012).

radicular component[13] to" his pain. Tr. 205.  Dr. Lin
concluded that Kershner could "return to the work force
full duty." Id.

Kershner was examined a second time by Dr. Lin
on March 17, 1999. Tr. 203-204.  Dr. Lin in a report of
that appointment indicated that no new radiological
studies had been performed since September of 1998. Tr.
203.  The results of Dr. Lin's physical examination of
Kershner were essentially normal, including Kershner was
neurologically intact, he had normal reflexes, no motor
deficits and "fairly good range of motion."  Dr. Lin
stated that Kershner came "within a few inches of being
able to touch his toes" and that Kershner did "have some
pain with extreme extension" Tr. 202.  Dr. Lin concluded
that Kershner "remains symptomatic for the low-grade
spondylolisthesis." Tr. 203.  Dr. Lin further concluded
that Lin could not return to his prior heavy to very

---

13.  This refers to shooting pain, numbness or tingling
in an extremity caused by a pinched nerve at the
nerve's root along the spinal column.  See Dorland's
Illustrated Medical Dictionary, 1571 (32nd  Ed. 2012).

heavy work but that he could lift up to 30 pounds and less than that amount on a frequent basis without giving a specific figure. Id.

Dr. Lin again examined Kershner on April 26, 2000. Tr. 200-201.  The results of a physical examination of Kershner by Dr. Lin were essentially normal, including normal reflexes,  negative straight leg raise testing, and normal strength, range of motion and gait. Tr. 201. Dr. Lin was still of the opinion that Kershner had "some residual symptomatology due to spondylolisthesis" which was a "pre-existing condition . . . made materially and significantly worse by his work injury. Id. Dr. Lin imposed a 30 pound lifting restriction. Id.

The next medical records which we encounter are from the year 2006.  However, before we delve into those records we would note that the only other radiographic evidence that we discern in the administrative record is a report of x-rays (4 views) of Kershner's lumbosacral spine which were conducted on June 17, 2008.  That

19

report states that there was "[n]o evidence of
spondylolisthesis" and the "[v]ertebral heights and
intervertebral disk spaces [were] intact." Tr. 270.  The
impression of Champak Dedhia, M.D., the physician
reading the x-ray films, was that Kershner had "[r]ight
sided spondylolysis at L5, mild scoliosis, mild
hypertrophic degenerative arthritic changes."[14]  Id.

On April 25, 2006, Kershner had an appointment
with Amarbir Gill, M.D., at which Kershner requested
that Dr. Gill complete documentation needed to obtain
welfare benefits. Tr. 215-219 and 256-260.  Kershner
told Dr. Gill that he had not seen a physician "in the
past five years." Tr. 215.  Kershner also stated that he
smoked 1 ½ packs of cigarettes per day and that he had
been doing so for 30 years. Tr. 216.  The results of a
physical examination of Kershner by Dr. Gill were
essentially normal other than elevated blood pressure

_____

14.  In essence Kershner suffered from mild degenerative
joint disease, also know as osteoarthritis, of the
lumbar spine.

(stage 1 hypertension) which was at 148/78.[15] Tr. 217.
Dr. Gill stated that Kershner had a "[n]ormal gait and
station" and "[n]o misalignment, asymmetry, crepitation,
defects, tenderness, masses, effusions, decreased range
of motion, instability, atrophy or abnormal strength or
tone in the head, neck, spine, ribs, pelvis or
extremities." Tr. 217.  Dr. Gill further stated that
neurologically Kershner was normal and Kershner had
normal sensation and deep tendon reflexes. Id.   Dr.
Gill advised Kershner to quit smoking and "stressed the
importance of regular exercise." Tr. 218.  Dr. Gill
noted that Kershner was "newly diagnosed" with diabetes
mellitus and prescribed the oral medication Glucophage
(metformin, generic name) for that condition. Tr. 217-

─────────────────

15.  Normal blood pressure is below 120/80;
prehypertension is 120-139/80-89; stage 1 hypertension
is 140-159/90-99; and stage 2 hypertension is 160/100
or more.  When the top number(systolic) is in the
abnormal range and the bottom number (diastolic) is
normal, the top number (systolic) is used to classify
the patient's condition. See High blood pressure
(hypertension), Mayo Clinic Staff, http://www.
mayoclinic.com/health/blood-pressure/HI00043/ (Last
accessed August 15, 2012).

218.   Dr. Gill also prescribed the drug Lisinopril for Kershner's high blood pressure. Tr. 219.

On May 6, 2006, Kershner was examined by Scott Prince, D.O., on behalf of the Bureau of Disability Determination. Tr. 223-255.   At the time of this examination, Kershner was smoking 1 pack of cigarettes per day. Tr. 224.   Kershner told Dr. Prince that he was seeing no one for his back pain and was not taking any pain medications. Tr. 224.   He further stated that "he still gets pain in his lumbar spine but it no longer goes down his right leg, and for the most part it is 'tolerable.'" Id.   The results of a physical examination of Kershner by Dr. Prince were essentially normal. Tr. 224-225.   Although Kershner's blood pressure was 132/76 and his forward bending was limited to 75 degrees (normal being 90 degrees),[16] Kershner's knee exam was completely normal, straight leg raise testing was negative bilaterally, Kershner had a normal gait, and he was able to walk on heel and toes and get up from a

───────────────────

16.   Tr. 274.

squatting position. Tr. 225.  Kershner had completely
normal range of motion other than as noted. Id.  Dr.
Prince considered Kershner's blood pressure and diabetes
"controlled." Id.

Kershner returned to Dr. Gill in June 2006 after
failing to keep a May 2006 appointment. Tr. 254-255.
The results of a physical examination of Kershner by Dr.
Gill were essentially normal. Id.  Kershner's blood
pressure was 120/78. Id.  Dr. Gill observed no
tenderness in Kershner's spine. Tr. 255.  Kershner told
Dr. Gill that his pain was stable. Tr. 254.  Kershner
was still smoking 1 pack of cigarettes per day and Dr.
Gill recommended that Kershner stop smoking. Tr. 254-
255.  Kershner failed to keep follow-up appointments in
July, November and December, 2006, as well as, March,
2007. Tr. 250-253.

When Kershner appeared at an appointment with
Dr. Gill on April 3, 2007,[17] Kershner reported that he

---

17.  The administrative law judge in his decision
incorrectly states that Kershner on this date had an
(continued...)

23

was still smoking 1 pack of cigarettes per day but was
watching his diet and trying to exercise and that his
blood sugar readings ran between 90 and 140.[18] Tr. 249.
The results of a physical examination were normal,
including Kershner's blood pressure was 98/58 and his
spine was "without deformity or tenderness." Id.
Kershner failed to appear at a schedule June 19, 2007,
appointment. Tr. 248.

On January 23, 2008, Kershner had an appointment
for a comprehensive medical examination with Sukhwinder
Kodial, M.D., an associate of Dr. Gill. Tr. 242-245 and

--------------------

17.  (...continued)
appointment with Binalkumar Landi, M.D. Tr. 21. The
correct spelling of the physician's surname is
"Ladani." Tr. 250. The record of the April 3, 2007,
appointment notes that Kershner was seen by "amg" which
is an abbreviation for Amarbir Gill, M.D. Tr. 248 and
250. Medical records are often difficult to decipher.
Kershner was scheduled to have an appointment with
Binalkumar Ladani, M.D., on March 6, 2007, but Kershner
cancelled that appointment. Tr. 250.

18.  Normal fasting blood glucose is 70-99 and normal
blood glucose 2 hours after eating is 70-145. Diabetes
Health Center, Blood Glucose, WebMed, http://diabetes.
webmd.com/blood-glucose?page=3 (Last accessed August
16, 2012).

290-293. The results of a physical examination were completely normal, including Kershner's blood pressure was 118/78. Id.  Kershner reported smoking 1 pack in 1 ½ days. Tr. 291. Kershner was advised to exercise regularly and quit smoking. Tr. 293.

Dr. Prince performed a second consultative examination of Kershner on June 17, 2008.  Tr. 267-274. Kershner told Dr. Prince that he had intermittent pain, four to five days per week at a level of 8 on a pain scale of 1 to 10. Tr. 267.  The results of a physical examination were essentially normal. Tr. 268-269. Kershner's blood pressure was 110/54. Tr. 268.  Dr. Prince found that Kershner was 5'6" tall and weighed 141 pounds; Kershner had full range of motion in his shoulders, elbows, wrists, knees, hips, cervical spine, lumbar spine and ankles. Tr. 273-274. Dr. Prince noted that Kershner had normal strength in his lower extremities; and Kershner's reflexes were essentially normal (4/4 on the left and 3/4 on the right patella(knee cap)). Tr. 268-269.  Kershner did have a

"slightly antalgic gait with a slight limp on the left" but he was able to toe and heel walk and get up from a squatting position without any difficulty. Id.  Dr. Prince completed a medical source statement of Kershner's work-related physical abilities which reveals that Kershner has the ability to engage in the full range of  medium work. Tr. 271-272.

On July 1, 2008, Kershner had an appointment with Lisa Tabbit, D.O., an associate of Dr. Gill. Tr. 287-289.  Kershner "had no complaints" and his blood pressure was 104/70. Tr. 287.  He told Dr. Tabbit that his blood sugar readings were in the 90s fasting and 120s post meals. Id.  The results of a physical examinations were normal. Id.

On July 15, 2008, Elizabeth Kamenar, M.D., reviewed Kershner's medical records on behalf of the Bureau of Disability Determination and concluded that Kershner could engage in the full-range of medium work. Tr. 275-281.  Dr. Kamenar found that Kershner had no

postural, manipulative, visual, communicative or
environmental limitations. Id.

Kershner had an appointment with Brooke
Polachek, a physician's assistant working in Dr. Gill's
office. Tr. 284-286.  Kershner reported that he was
smoking 1 pack of cigarettes per day. Tr. 284.  The
results of a physical examination were essentially
normal. Tr. 285.  Kershner's blood pressure was slightly
elevated at 130/80 and Kershner had some tenderness over
the lumbar spine and paraspinal muscles but no spasms.
Tr. 284-285. Blood was drawn for an Hgb A1C test. Tr.
285.  The results of that test were 6.4 indicating that
Kershner's diabetes was well controlled.[19] Tr. 283.

_____

19.  The A1C blood test is a test that measures the
amount of glycated hemoglobin or glycohemoglobin in the
blood.  It is used to monitor the control of diabetes
mellitus.  Glycohemoglobin is hemoglobin to which
glucose is bound.  Glucose stays attached to hemoglobin
for the life of the red blood cells, 120 days.  A1C
reflects the average blood glucose and gives a good
estimate of how well an individual manages his or her
diabetes over the prior 2 to 3 months.  The normal A1C
level is 7% according to the American Diabetes
Association and 6.5% according to the American
Association of Clinical Endocrinologists. An A1C level
(continued...)

At an appointment on March 26, 2009, with Ira Vohra, M.D., an associate of Dr. Gill, Kershner reported feeling good and denied numbness in the extremities. Tr. 282-283.  The results of a physical examination were essentially normal. Id.  Kershner's blood pressure was 120/76. Tr. 282.  Dr. Vohra stated that Kershner's diabetes was well controlled. Tr. 283.

**Discussion**

The administrative law judge at step one of the sequential evaluation process found that Kershner had not engaged in substantial gainful work activity since April 30, 2008, the date Kershner filed his application for SSI. Tr. 18. The administrative law judge noted that Kershner worked during the third quarter of 2008 and in August, 2009.  Id.  Specifically, the administrative law judge stated as follows: "The claimant testified that he

---

19.  (...continued)
of 6.5 translates to an estimated average glucose of 140. American Diabetes Association, Estimated Average Glucose, http://www.diabetes.org/living-with-diabetes/treatment-and-care/blood-glucose-control/estim ated-average-glucose.html (Last accessed August 16, 2012).

last worked as a taxi driver in August of 2009.

Previously, he had indicated that although he became

unable to work due to his alleged impairments on May 1,

2006, that he did not stop working until January 1, 2007

and that he stopped working because he got robbed.

Nevertheless, even though there is evidence that the

claimant has engaged in substantial gainful activity,

the undersigned has considered the other steps in the

sequential evaluation of this claim." Id.

At step two of the sequential evaluation

process, the administrative law judge found that

Kershner had the following severe impairments: "history

of low back pain." Tr. 18. The administrative law judge

found that Kershner's high blood pressure and diabetes

were non-severe impairments because they were well-

controlled with medications and there was no evidence

that they caused any work-related functional

limitations. Id. The administrative law judge further

found that there was no medical evidence to support

Kershner's claim that he had a pinched nerve in his

right leg, arthritis in his knees and blurry vision. Tr. 19.

At step three of the sequential evaluation process the administrative law judge found that Kershner's impairments did not individually or in combination meet or equal a listed impairment. Id.

At step four of the sequential evaluation process the administrative law judge found that Kershner had the residual functional capacity to perform  medium work as defined in the regulations. Tr. 19. Specifically, the administrative law judge found that Kershner could engage in medium work involving "lifting no more than 50 pounds at a time and with frequent lifting or carrying of objects weighing 25 pounds" and which did not "involve the processing of complex instructions, particularly written materials." Id.  In concluding that Kershner had the ability to engage in medium work the administrative law judge relied on the opinions of Dr. Prince and Dr. Kamenar both of whom found that Kershner could engage in such work.

The administrative law judge based on a residual functional capacity of medium work as described above and the testimony of a vocational expert found that Kershner had the ability to perform his past relevant work as a taxi cab driver. Tr. 23.  Because Kershner could perform his past relevant work as a taxi cab driver, the administrative law judge found that Kershner was not disabled.  In addition, and in the alternative, based on the medium work RFC mentioned above and the testimony of the vocational expert, the administrative law judge found that there was other medium work that Kershner could perform. Specifically, the ALJ found that Kershner could perform work as a warehouse worker, bagger, and packager, and that there were a significant number of such jobs in the labor market of Northeastern Pennsylvania where Kershner resided. Tr. 24.

The administrative record in this case is 307 pages in length and we have thoroughly reviewed that record.  The administrative law judge did an excellent job of reviewing Kershner's vocational history and

medical records in his decision. Tr. 16-25.
Furthermore, the brief submitted by the Commissioner
sufficiently reviews the medical and vocational evidence
in this case. Doc. 31, Brief of Defendant.

Kershner argues that the administrative law
judge erred by (1) finding that he could perform medium
work, including his prior relevant work as a taxi cab
and work as a warehouse worker, bagger driver and
packager; (2) finding that Kershner's description of the
severity of his pain was so extreme to appear
implausible; and (3) failing to consider Kershner's
severe and non-severe impairments in combination in
presenting his hypothetical questions to the vocational
expert.  Kershner also appears to argue that he should
have been found presumptively disabled based on his
advanced age and limited education.  Based on our review
of the record, we find no merit in Kershner's arguments.

The Social Security regulations require that an
applicant for disability insurance or supplemental
security income benefits come forward with medical

evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled."  20 C.F.R. § 404.1512(c). Kershner failed to provide such evidence. No treating or examining physician provided a statement indicating that Kershner on and after the alleged disability onset date of May 1, 2006, had functional limitations for the requisite continuous 12 month period[20] that would prevent him from engaging in the range of medium work set by the administrative law judge.

The record contains functional assessments from Dr. Prince and Dr. Kamenar both of which support the

---

20. As stated earlier in this memorandum to receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

administrative law judge's decision.  The administrative law judge's reliance on those assessments was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011) ("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]"). The administrative law judge appropriately relied on the evaluations of Dr. Prince and Dr. Kamenar and appropriately evaluated Kershner's functional abilities. Substantial evidence supports the administrative law judge's residual functional capacity determination.

In setting the residual functional capacity, the administrative law judge considered Kershner's credibility and determined that Kershner's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the ability to perform a range of medium work. Tr. 20. In finding that Kershner

was not credible the administrative law judge stated as
follows:

> The office visit notes reflect numerous
> occasions on which the claimant did not
> specify any particular complaint, which
> contrasts with the current claim of ongoing,
> disabling symptoms since the alleged onset
> date.  The claimant never sought or received
> treatment from a specialist.  He alleged during
> the hearing that he requested a referral to a
> back doctor, but the records do not reflect that
> nor do they support his allegations.

> The claimant's description of the severity of
> the pain has been so extreme as to appear
> implausible, particularly since he has not
> sought or received treatment.[21]  Additionally,
> the claimant said that he has a young son and
> that his wife works.  Although the claimant
> alleges that he cannot do virtually anything,
> including dressing himself, there is no
> evidence that the claimant requires any
> assistance with taking care of his son.

> The record reflects that the claimant has made
> inconsistent statement(s) regarding matters
> relevant to the issue of disability.  For
> example, the claimant said that he does not
> go shopping and that his wife does all the
> shopping . . . but during the hearing, he
> explained that it now takes him longer to walk
> to the store near his house.  He also stated
> that he cannot drive because he cannot sit too
> long . . ., yet the claimant has worked as a

---

21. Kershner admitted that he took no pain medications.
Tr. 224.

taxi cab driver until relatively recently and he
testified that he could not do it because he
could not handle sitting for 12 hours per day
(Hearing Testimony).

As mentioned earlier, the records reflect
work activity after the alleged onset date.
Although all of that work activity may not
constitute disqualifying substantial gainful
activity, it does indicate that the claimant's
daily activities have, at least at times, been
somewhat greater than the claimant has generally
reported.

Tr. 23.  The administrative law judge was not required

to accept Kershner's subjective claims regarding his

physical or mental limitations.  See Van Horn v.

Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing

that credibility determinations as to a claimant's

testimony regarding the claimant's limitations are for

the administrative law judge to make).  It is well-

established that "an [administrative law judge's]

findings based on the credibility of the applicant are

to be accorded great weight and deference, particularly

since [the administrative law judge] is charged with the

duty of observing a witness's demeanor . . . ."  Walters

v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th

Cir. 1997); see also Casias v. Secretary of Health &
Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We
defer to the ALJ as trier of fact, the individual
optimally positioned to observe and assess the witness
credibility."). Because the administrative law judge
observed Kershner when he testified at the hearing on
November 17, 2009, the administrative law judge is the
one best suited to assess the credibility of Kershner.

Kershner's contention that he is presumptively
disable under the Medical-Vocational Guidelines is
devoid of merit. At the time of the administrative
hearing and the administrative law judge's decision,
Kershner was 58 years of age. Under the Social Security
regulations a person 55 and older is considered a
"person of advanced age." 20 C.F.R. § 416.963(d). The
Social Security Administration considers a claimant 55
years of age and older as being in an age category which
"significantly affects a person's ability to adjust to
other work" and there are "special rules" for such
persons. Id. Those rules are set forth in the Medical-

37

Vocational Guidelines, 20 C.F.R., Part 404, Subpart P., Appendix 2.  Under those guidelines, if Kershner would have been limited to light work and found to have no transferable job skills and unable to perform any past relevant work, he would have been considered disabled under Rules 202.01 and 202.02.  However, the administrative law judge found that Kershner was capable of engaging in medium work as well as performing his prior relevant work as a taxi cab driver and as stated above those findings are supported by substantial evidence.[22]

---

22.  Contained within the Social Security regulations are grids or tables which list Rules 201.01 through 201.29 (for sedentary work), 202.01 through 202.22 (for light work) and 203.01 through 203.31 (for medium work) in the left hand column.  These grids or tables are found at 20 C.F.R., Pt. 404, Subpt. P, App. 2.  The Social Security regulations provide that "where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." Rule 200.00.  In the right hand column of the grid or table is set forth the "Decision" as to whether a claimant is "disabled" or "not disabled.  Section 203.00(b) of the Medical-Vocational Guidelines provides that "[t]he

(continued...)

Finally, Kershner's contention that the administrative law judge did not consider his impairments in combination needs no elaborate discussion.  It is clear from a review of the administrative law judge's thorough opinion that he considered both Kershner's severe and non-severe impairment in combination when setting Kershner's residual functional capacity.  The record amply supports the administrative law judge's finding that Kershner's high blood pressure and diabetes were non-severe impairments. No treating or examining physician indicated that those conditions would impact his physical work-related functional abilities.  Moreover,

------

22.  (...continued)
functional capacity to perform medium work represents such substantial work capability at even the unskilled level that a finding of disabled is ordinarily not warranted in cases where a severely impaired person retains the functional ability to perform medium work. Even the adversity of age (55 or over) and a work history of unskilled work may be offset by the substantial work capability represented by the functional capacity to perform medium work."  In the present case, Kershner was found capable of performing work as a taxi driver described by a vocational expert as semi-skilled, medium work. Tr. 43.

when posing a hypothetical to the vocational expert an administrative law judge need only include functional limitations that are established by the medical evidence.[23]

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

s/Sylvia H. Rambo
United States District Judge

Dated:  September 18, 2012.

_____

23. Counsel for Kershner could have asked additional questions of the vocational expert and he failed to do so.